UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

James Mathews,

        Plaintiff,

        v.                              Civil Action No. 5:12-cv-58

Andrew Pallito, Correct Care
Solutions, Inc., Trudee Ettlinger,
Lori Bull,

        Defendants.

## REPORT AND RECOMMENDATION
(Docs. 37, 63)

Plaintiff James Mathews, a current Vermont inmate, brings this action under 42

U.S.C. § 1983 and various provisions of state law, claiming that Defendants—Vermont

Department of Corrections (DOC) officials and others involved in healthcare at Vermont

correctional facilities—provided him with improper medical care for his diabetes and for

a MRSA infection.[1]  (Doc. 37.)  Mathews, who is African-American, asserts that

Defendants were deliberately indifferent to his serious medical needs, and that he was

treated differently and received substandard medical care on account of his race.  In

addition to his § 1983 claims, Mathews also claims that Defendant Andrew Pallito

---

[1]  "MRSA" is an abbreviation for methicillin-resistant *Staphylococcus aureus*, a type of staph infection.  *Stedman's Medical Dictionary* 1232 (28th ed. 2006).  As this court has previously noted, "MRSA is a strain of staph that is resistant to the broad-spectrum antibiotics commonly used to treat ordinary staph infections, and, as a consequence, can sometimes become life threatening."  *McGarry v. Pallito*, No. 1:09-cv-128, 2013 WL 3338682, at *2 n.1 (D. Vt. July 2, 2013).

breached a nondelegable duty of care, and that Defendants Correct Care Solutions, Inc. (CCS), Trudee Ettlinger, and Lori Bull are liable on a theory of medical negligence.  For relief, Mathews seeks money damages.  (*Id.* at 5.)

Currently pending before the court is a Motion for Summary Judgment filed by Defendants pursuant to Fed. R. Civ. P. 56.  (Doc. 63.)  Defendants argue that Mathews has failed to adduce sufficient evidence to support his claims.  The court heard argument on the Motion on July 17, 2014.  For the reasons that follow, I recommend that Defendants' Motion for Summary Judgment (Doc. 63) be GRANTED.

## Factual Background

The following facts are undisputed except where noted.[2]  Plaintiff James Mathews was born in 1979 and was diagnosed with diabetes in 2004.  His treatment regimen for diabetes includes glucose-level checks by means of finger sticks three times a day and insulin treatment.  Mathews also has a history of foot ulcers, which began in 2009.  Since 2002, Mathews has been incarcerated several times in the custody of the DOC.  At all relevant times, Defendant CCS provided health and medical services to inmates in DOC custody pursuant to a contract with the State of Vermont.

In March 2010, Mathews was briefly incarcerated at the Chittenden Regional Correctional Facility (CRCF), and was released on April 2, 2010.  While in the

---

[2]  In support of their factual assertions, Defendants rely heavily upon the April 4, 2014 affidavit of CCS Regional Medical Director Dr. Michael Rapaport (Doc. 63-5).  According to Dr. Rapaport, all of the statements made in his affidavit are based upon his review of Mathews' medical chart.  (*Id.* at 1, ¶ 1.) Dr. Rapaport's affidavit contains and cites extensively to an exhibit consisting of approximately 50 pages of medical records.  (Doc. 63-6.)  Defendants and Mathews each cite portions of Mathews' September 18, 2013 deposition.  (*See* Docs. 63-2; 64-11.)  In support of the disputes that Mathews articulates, he cites only his deposition testimony, the medical records cited by Dr. Rapaport (Doc. 63-6), and a separate 42-page collection of "Excerpted Medical Records" (Doc. 64-10).

community, on April 12, 2010, Mathews was diagnosed with MRSA on his left first toe, and underwent a debridement procedure at Fletcher Allen Health Care (FAHC). Mathews was discharged on April 15, 2010, but was returned for continuing treatment several times over the following months.  Mathews developed a foot ulcer on his left mid foot, for which he received treatment on July 19, 2010 at FAHC.

Mathews was again incarcerated at CRCF on May 26, 2010.  On or about July 24, 2010, Mathews was seen by CRCF medical staff for a wound on his left foot. Dr. Garry Weischedel ordered that Mathews' left foot ulcer be treated with wet-to-dry dressing changes and ordered a prescription for clindamycin to treat the MRSA infection.[3]

It is undisputed that while at CRCF Mathews was not fully compliant with his regimen of finger sticks.  (*See* Doc. 63-2, Mathews Dep. 58:20–25 (stating that in 2010, he was "50/50" compliant).)  It is also undisputed that, on some occasions after arriving at CRCF, Mathews refused dressing changes, however the parties dispute whether to characterize those refusals as "regular" or merely "occasional."  Dr. Rapaport states that Matthews "began regularly refusing dressing changes."  (Doc. 63-5 at 1, ¶ 4.)  Mathews

---

[3]  Clindamycin is an antibiotic used for treating serious infections, and is generally reserved for patients who are allergic to penicillin.  *See Physician's Desk Reference* 2421 (54th ed. 2000).  Mathews' medical records indicate that he has a penicillin allergy.  (*E.g.*, Doc. 63-6 at 1, 4.)

contends that the description of his refusals as "regular" is unsupported by his medical records.[4]

It is undisputed that, in or around September 2010, Mathews was transferred to the Northern State Correctional Facility (NSCF).  Defendant Lori Bull, R.N. was at all relevant times the Head Nurse and Health Services Administrator for NSCF.  Defendants assert that Mathews continued to receive "regular" treatment for both his foot ulcer and diabetes at NSCF, including insulin injections and dressing changes.  (Doc. 63-5 at 2, ¶ 5 (citing Doc. 63-6 at 5–14).)  Mathews concedes that he received some medical care, but disputes that he received "regular" treatment.

On September 27, 2010, Dr. Abigail Hagler ordered a prescription of clindamycin to treat Mathews' infection.  Also on that date, Dr. Hagler made a note about getting an appointment with a podiatrist.  (Doc. 64-6 at 15.)  According to Dr. Rapaport, "NSCF continued to treat and closely monitor Mr. Mathews' wound in the following months and observed significant improvement."  (Doc. 63-5 at 2, ¶ 7 (citing Doc. 63-6 at 16–20).)  Mathews does not dispute that his foot improved during that time, but says he disputes that NSCF "treated and closely monitored" his wound.  In support of that assertion, Mathews states that he requested but failed to promptly receive diabetic footwear.  (*See* Doc. 64-11, Mathews Dep. 117:2–12 (stating that he was fitted for shoes, but that he never saw them).)

---

[4]  A review of the medical records supplied by both parties reveals the following.  Of the 19 "Wound Care Flowsheets" in the records (the earliest dated September 10, 2010 and the latest dated March 9, 2012), 12 indicate one or more instances where Mathews refused treatment or did not show up. Of the 71 total days of scheduled wound care documented on those flow sheets, Mathews refused or did not show up a total of 32 times.  The medical records also contain five "Refusal of Treatment" forms dated November 25, November 29, December 7 (two forms), and December 21, 2011.

On October 14, 2010, podiatrist Dr. Denis Lamontagne saw Mathews and noted that the ulceration on the left foot seemed to be improving.  Dr. Lamontagne ordered continued wet-to-dry dressings until the wound was closed.  Dr. Lamontagne's notes from that appointment make no mention of therapeutic or diabetic shoes.  On December 17, 2010, Dr. Weischedel saw Mathews and observed that the wound had fully healed.

Dr. Weischedel saw Mathews again on December 27, 2010 and noted a callus at the site of his foot wound, and the thickened skin was pared off.  Dr. Wieschedel's notes also indicate: "P[atien]t regularly refuses FS. . . . Rarely has AM or noon FS.  Discussed. P[atien]t aware of potential consequences of less control – neuropathy, nephropathy, CAD, retinopathy."  (Doc. 63-6 at 23.)

A follow-up appointment was made with Dr. Lamontagne for March 2011, but Mathews refused the treatment.

In or around May 2011, Mathews again developed an ulcer on his left foot.  In response, on May 10, 2011, Dr. Delores Burroughs-Biron ordered that Mathews be admitted to the infirmary/Medical Housing Unit (MHU), and prescribed clindamycin and regular wet-to-dry dressing changes until healed.  Mathews' wound began to improve and he was discharged from the MHU on May 17, 2011.  Dr. Burroughs-Biron discussed the case with an orthopedist at FAHC, who did not feel an in-office evaluation was indicated, but developed a plan for treatment and monitoring with Dr. Burroughs-Biron.

Defendants assert that the discussion and plan were explained to Mathews prior to his discharge.  Mathews says that the discussion and plan may not have been adequately

communicated to him in a way that he could understand.  According to Defendants, per her discussion with the FAHC orthopedist, Dr. Burroughs-Biron ordered continued wet-to-dry dressings and monitoring of Mathews' ulcer, and emphasized the importance of strictly adhering to the plan of care for the ulcer.  Mathews again asserts that the discussion and plan may not have been adequately communicated to him in a way that he could understand.

Despite Dr. Burroughs-Biron's warning, Mathews continued to occasionally refuse wet-to-dry dressings and diabetic treatment over the following months.  His foot ulcer improved over time and nearly resolved until another ulcer developed on his left foot in early August 2011.  On August 11, 2011, Dr. Burroughs-Biron saw Mathews and prescribed Bactrim and wet-to-dry dressings until healed.  She also scheduled weekly follow-up visits.  Mathews, however, refused some treatments over the following weeks. Mathews' refusals occurred "routinely," according to Dr. Rapaport.  (Doc. 63-1 at 4, ¶ 26.)  Mathews maintains that the evidence shows only "occasional" refusals.

On August 18, 2011, Mathews refused his prescribed dressing change, stating that he was waiting to have his foot removed, which would allow him to collect disability benefits.  The Nursing Progress Notes for that date indicate that the nurse sent Mathews back to his unit "after advising him to start being more compliant with his dressing change ordered by Dr. Burroughs-Biron."  (Doc. 63-6 at 37.)  Mathews says that he was not serious when he said that he would have his foot amputated to receive disability benefits.  (*See* Doc. 64-11, Mathews Dep. 99:9–19 (responding to suggestion that he said the loss of a limb would entitle him to disability: "I think that is funny").)

6

On August 25, 2011, Mathews was seen by Dr. Burroughs-Biron as part of his Chronic Care visit.  Her examination revealed that the chronic ulcer on the right foot was healed over.  According to Dr. Burroughs-Biron, Mathews was reluctantly interested in seeing the podiatrist in St. Johnsbury to discuss getting diabetic shoes and more definite treatment.  Dr. Burroughs-Biron's assessment includes a note that Mathews was doing "pretty well" and that he seemed "more motivated to self[-]care."  (Doc. 63-6 at 39.)  It appears that Mathews did in fact see Dr. Lamontagne on September 28, 2011, and at that appointment the podiatrist prescribed "therapeutic shoes with accommodative inlays to offload the ulcerated area."  (*Id.* at 21.)

On October 31, 2011, a corrections officer noted what appeared to be a large open wound on the bottom of Mathews' foot while he was drying off from a shower.  She asked him about his foot, and he told her that his foot needed to be amputated, but he was not going to have it done while he was incarcerated.  He further stated that it did not hurt much and he did not need medical attention.

On November 1, 2011, Mathews was brought to be seen and evaluated by Dr. Borroughs-Biron, but he refused to have his foot evaluated.  Dr. Burroughs-Biron noted that the podiatrist had recommended diabetic footwear, but that Mathews was "not interested in following through" and that he had stated that he wanted "nothing to do with having [his] foot cared for."  (Doc. 63-6 at 43.)  Despite Dr. Burroughs-Biron's warnings about the risks associated with refusing treatment, including amputation, Mathews stated that he was not concerned with the prospect of amputation because he could then collect disability.  Dr. Burroughs-Biron noted that she was "unsure as to his sincerity" since

Mathews had stated that he could get disability benefits if his foot were amputated.  (Doc. 63-6 at 43.)[5]  Mathews again states that he was not serious when he said that he would have his foot amputated to receive disability benefits.  Dr. Burroughs-Biron urged Mathews to accept treatment, but he refused.

On November 11, 2011, Mathews filed a health service request seeking treatment for his foot ulcer.  Nonetheless, when he was seen on November 13, 2011, he again refused treatment for his foot.  On November 22, 2011, Mathews was again examined by Dr. Weischedel, and was again prescribed wet-to-dry dressing changes.  Dr. Weischedel's notes for that date indicated that Mathews "understands that he is at risk of amputation without significant improvement in care/compliance."  (Doc. 63-6 at 46.) Mathews was seen again on December 6, 2011 and was prescribed Bactrim.

At some point in November or December 2011, Dr. Burroughs-Biron contacted Mathews' mother.  She did so because, according to her deposition testimony:

> James had had a lengthy course in my interactions with him preceding me and preceding incarceration, from my recollection, where he was not participative in his—in his care, and he continued not to participate in his care and made statements to the effect that he was choosing to have an amputation; rather than potentially prevented through his actions, that that was his choice.

(Doc. 63-7, Burroughs-Biron Dep. 74:13–20.)  Dr. Burroughs-Biron states that "the gist of the conversation was how I might further encourage James to accept treatment and not to allow his illness to deteriorate any further."  (*Id.* at 74:23–75:1.)

---

[5]  Dr. Burroughs-Biron has apparently since concluded that Mathews has been sincere about not wanting to get better.  (*See* Doc. 63-7, Burroughs-Biron Dep. 75:15–18 ("Q.  Did it seem to you that he was sincere about not wanting to get better?  A.  After repeated conversations, I became more convinced that he was sincere.").)

In a letter dated December 27, 2011, DOC Interim Health Services Director

Defendant Trudee Ettlinger, Ph.D. sent Mathews a letter stating:

> I received your letter describing the problem with a wound on your foot.  I
> have spoken with health services and I am told that you are cooperating
> with the treatment and that the wound is healing.  I am also told that you
> have been talking about returning to your job in the kitchen.   Please
> continue to follow medical advice and if you find that your foot is not doing
> well, please talk with medical staff.

(Doc. 63-8.)  A copy of the letter was sent to Lori Bull.  Dr. Ettlinger did not conduct any

investigation beyond speaking with a nurse an NSCF because she felt that "the answer

that I was given was adequate, that the respondent was aware of Mr. Mathews' health

problem with his foot."  (Doc. 63-9, Ettlinger Dep. 35:8–10.)  It is undisputed that

Defendant Ettlinger was not personally involved in directing or providing Mathews'

medical care.  The only act on Dr. Ettlinger's part to which Mathews refers is her

December 27, 2011 letter.

In January 2012, Dr. Weischedel ordered a medication change for Mathews,

indicating: "I do not know why he is on scheduled regular insulin 10u qds as opposed to

long lasting.  Will change to NPH 6 bid."  (Doc. 64-3 at 4.)  According to Mathews, "I

should have gotten long-lasting insulin the whole time because it works better for me."

(Doc. 63-10 at 6.)

Throughout this time period (late 2011), Mathews refused treatment (Defendants

say repeatedly; Mathews says only occasionally) for the wound.[6]  Mathews refused

treatment despite warnings and consults from medical personnel that failing to comply

---

[6]  The medical records contain "Refusal of Treatment" forms dated November 25 and 29, as well
as December 7 (two forms) and 21, 2011.  (Doc. 63-6 at 48–52.)

with the treatment could result in permanent disability or amputation.  Over the next several months, despite warnings from medical personnel, Mathews continued to refuse treatment (Defendants say frequently; Mathews says occasionally) until he was ultimately released on or about March 12, 2012.[7]  Following his release, Mathews' wound worsened.  On April 18, 2012, his fourth left toe was amputated.

Based on his review of Mathews' medical chart, Dr. Rapaport states that during Mathews' incarceration, Mathews "received appropriate medical treatment"; that he "frequently refused treatment and disregarded the orders of medical personnel, with respect to both his foot ulcers and his diabetes management"; and that "medical staff routinely sought to provide Mr. Mathews with care and educate him regarding the possible consequences of refusing treatment."  (Doc. 63-5 at 5, ¶¶ 30–32.)  Mathews says he disputes each of those assertions as either conclusory or unsupported by the medical record.

With respect to why he missed medical treatment, Mathews gives a number of reasons.  Mathews states:

> On occasion, I missed medical treatment because the CO would not let me out of the unit in time to go to the infirmary for my appointment.  I have occasionally refused insulin because I was given the wrong insulin in the past and I worried about having a bad reaction again.  I can feel when my blood sugar is low so I sometimes do not have it tested if I feel okay.  A few times, I was given the wrong medication and then did not take the offered medication afterwards because I was worried about having a bad reaction to the wrong medication.  Sometimes I left the infirmary if the nurses were being offensive towards me and making it very difficult for me to receive care.

---

[7]  Wound care flow sheets covering the period from January 28, 2012 through March 11, 2012 indicate that Mathews refused care on 8 out of 32 days.  (Doc. 63-6 at 53–58.)

(Doc. 63-10 at 11.)  Mathews also says that he should have been given antibiotics for treating MRSA in the afternoon "because receiving them before breakfast made me nauseous and made me unable to take the medication as prescribed."  (*Id.* at 6–7.)  A March 2013 progress note indicates that Mathews and staff agreed that he would receive daily treatment and antibiotics in the afternoons.  (Doc. 64-5 at 2.)

According to Mathews, Defendants never ascertained whether he is a Type 1 or a Type 2 diabetic.[8]  The following additional facts are undisputed.  Defendant Pallito had no involvement in the treatment of Mathews' foot ulcers and never denied Mathews treatment for either his diabetes or his foot ulcers.  Mathews' racial-discrimination claim is predicated on the conduct of a single nurse named "Lori" (not Defendant Lori Bull), who allegedly made racist remarks and, on at least one occasion, skipped over Mathews and other inmates in administering medical care.

## Analysis

### I.   Summary Judgment Standard

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, the discovery and the disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also Celotex Corp.*

---

[8]  The medical records do indeed contain contradictory information on that point.  An early Progress Note (dated July 24, 2010) indicates that Mathews reported having diabetes Type 2.  (Doc. 63-6 at 3.)  An August 4, 2010 chronic-care form also indicates Type 2, (Doc. 64-10 at 2), as does a March 13, 2012 hospital report (Doc. 63-6 at 59) and a May 30, 2012 Comprehensive Diabetes Foot Examination Form (Doc. 64-10 at 4).  In contrast, May 13, 14, and 17, 2011 Infirmary Progress Notes describe Mathews as a Type 1 diabetic.  (Docs. 64-10 at 3, 28; 63-6 at 27.)  A January 9, 2013 Comprehensive Diabetes Foot Examination Form indicates diabetes Type 1.  (Doc. 64-10 at 5.)  A "Patient Profile – Summary" for Mathews indicates Type 1 diabetes observed on January 31, 2013.  (Doc. 64-10 at 6.)

*v. Catrett*, 477 U.S. 317, 322 (1986).  In deciding whether there is a genuine issue of material fact, the court must "interpret all ambiguities and draw all factual inferences in favor of the nonmoving party."  *Salahuddin v. Goord*, 467 F.3d 263, 272 (2d Cir. 2006). The burden of demonstrating the absence of a genuine issue of material fact rests upon the party seeking summary judgment.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  Once a properly supported motion for summary judgment has been made, the burden shifts to the nonmoving party to set out specific facts showing a genuine issue for trial.  *See* Fed. R. Civ. P. 56(2).  The rules require that a nonmoving party set forth specific facts in the affidavits, depositions, answers to interrogatories, or admissions, showing that a genuine issue exists for trial.  *Cifarelli v. Vill. of Babylon*, 93 F.3d 47, 51 (2d Cir. 1996) (citing *Celotex,* 477 U.S. at 324).

## II.   Mathews' Section 1983 Claims

Section 1983 of Title 42 provides a cause of action against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws . . . ."  42 U.S.C. § 1983. "The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails."  *Wyatt v. Cole*, 504 U.S. 158, 161 (1992).  "A § 1983 claim has two essential elements: (1) the defendant acted under color of state law; and (2) as a result of the defendant's actions, the plaintiff suffered a denial of h[is] federal statutory rights, or h[is] constitutional rights or privileges."  *Annis v. Cnty. of Westchester*, 136

F.3d 239, 245 (2d Cir. 1998).  Here, Mathews claims that Defendants violated his Eighth Amendment rights by deliberate indifference to his serious medical needs.  He also claims that Defendants violated his Fourteenth Amendment rights by favoring white inmates for medical treatment.

## A.   Deliberate-Indifference Claim—Personal Involvement

Defendants argue that Defendants Pallito and Ettlinger had no personal involvement that might subject them to any Eighth Amendment claim.  Mathews concedes that Pallito lacked personal involvement with respect to the Eighth Amendment claim, but argues that Defendants Ettlinger, Bull, and CCS were personally involved. (Doc. 64 at 8.)

"'It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'"  *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 135 (2d Cir. 2013) (quoting *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)).  "For this reason, the doctrine of *respondeat superior* cannot be used to establish liability under Section 1983." *Blyden v. Mancusi*, 186 F.3d 252, 264 (2d Cir. 1999).  As the Second Circuit has explained:

> The personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate

indifference to the rights of inmates by failing to act on information
indicating that unconstitutional acts were occurring.

*Colon*, 58 F.3d at 873. "The burden is on a plaintiff to present sufficient evidence to demonstrate the personal involvement of each of the defendants, and it has been recognized that a defendant's motion for summary judgment must be granted in the absence of such evidence." *Lewis v. City of New York*, No. 07 Civ. 7258(CM), 2010 WL 2836112, at *4 (S.D.N.Y. June 29, 2010) (internal quotation marks omitted). Here, Mathews concedes that Defendant Pallito was not personally involved with respect to any of Mathews' claims. I therefore address the personal involvement question as to each of the other three Defendants.

Defendant Ettlinger asserts that she was not personally involved in directing or providing Mathews' medical care. According to Mathews, Ettlinger was personally involved because she received and responded to his letter in December 2011, and because the letter indicates that she checked on the treatment that he received. This court has previously noted that, when an official personally looks into matters raised in a prisoner's letter of complaint, "'or otherwise acts on the prisoner's complaint or request, the official may be found to be personally involved.'" *Byrne v. Trudell*, No. 1:12-cv-245-jgm-jmc, 2013 WL 2237820, at *9 (D. Vt. May 21, 2013) (quoting *Rivera v. Fischer*, 655 F. Supp. 2d 235, 238 (W.D.N.Y. 2009)).

I conclude that that Mathews has not met his burden to show Ettlinger's personal involvement. Mathews has not supplied a copy of the letter that prompted Ettlinger's December 2011 response. Ettlinger's letter indicates only that she was made aware of a

14

problem with a wound on Mathews' foot, and that after an inquiry she learned that Mathews was cooperating with treatment and that his wound was healing. Here, there is no evidence that she had even the "scantest awareness" of the claims Mathews now asserts; only that she was made aware of an injury on his foot. *Mateo v. Fischer*, 682 F. Supp. 2d 423, 431 (S.D.N.Y. 2010). Ettlinger's letter contains no "detailed response" specifically addressing issues of deliberate indifference to serious medical needs. *Id.* at 430. Moreover, there is no evidence that Ettlinger, in responding to Mathews' letter, failed to remedy any wrong. *Cf. Byrne*, 2013 WL 2237820, at *10 (concluding, in the context of a motion to dismiss, that plaintiff had sufficiently alleged defendant's personal involvement as a supervisory official who, after being informed of a violation through a report or appeal, failed to remedy the wrong). Rather, Ettlinger's response indicates that the remedy for Mathews' injury was already underway.

CCS, as a private employer, cannot be "liable under § 1983 for the constitutional torts of [its] employees unless the plaintiff proves that 'action pursuant to official . . . *policy* of some nature caused a constitutional tort.'" *Rojas v. Alexander's Dep't Store, Inc.*, 924 F.2d 406, 408 (2d Cir. 1990) (internal citations omitted; quoting *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658, 691 (1978)); *see also Estiverne v. Esernio-Jenssen*, 910 F. Supp. 2d 434, 442 (E.D.N.Y. 2012) ("Like government employers, private employers who are found to be state actors are not responsible, under a theory of *respondeat superior*, for the constitutional torts of their employees."); *Seifert v. Corr. Corp. of Am.*, No. 2:09 CV 119, 2010 WL 446969, at *5 (D. Vt. Feb. 1, 2010). Here, Mathews has not advanced evidence of any such custom or policy, or of grossly

15

negligent supervision under *Colon*.  There is no basis for § 1983 liability against CCS. *See Parkell v. Morgan*, No. 12-1304-SLR, 2014 WL 2568404, at *6 (D. Del. June 6, 2014) (granting motion for summary judgment where plaintiff had presented no evidence of a CCS policy or custom to deprive him of medical care).

Regarding Defendant Bull, it is undisputed that she was the Head Nurse and Health Services Administrator for NSCF.  To the extent that Mathews is alleging supervisory liability, he has failed to advance any evidence that she failed to remedy a violation after being informed, that she created or sanctioned a policy or custom under which the alleged violations occurred, that she was grossly negligent in her supervisory duties, or that she failed to act on information indicating that unconstitutional acts were occurring.  To the extent that Bull was directly involved in providing medical care to Mathews, none of Mathews' allegations relate to any particular act or omission on Bull's part.

For the above reasons, I conclude that Mathews has failed to meet his burden of presenting sufficient evidence of personal involvement with respect to any Defendant. Even if that were not the case, Mathews' Eighth Amendment claim would fail on its merits for the reasons discussed below.

### B.     Deliberate Indifference—Objective and Subjective Prongs

Defendants CCS and Bull argue that Mathews has failed to adduce any evidence that they intentionally disregarded his medical needs.  Mathews insists that the medical care he was provided demonstrates deliberate indifference towards him.  Defendants

argue that, at most, Mathews is claiming medical malpractice that does not rise to the level of deliberate indifference.

In *Estelle v. Gamble*, the United States Supreme Court determined that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." 429 U.S. 97, 104 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). A prisoner must therefore demonstrate both that the alleged deprivation is, in objective terms, "sufficiently serious," and that, subjectively, the defendant is acting with a "sufficiently culpable state of mind." *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994). Both the objective and subjective components must be satisfied in order for a plaintiff to prevail. *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996).

Under the objective component, in assessing whether a medical condition is "sufficiently serious," courts consider all relevant facts and circumstances, including whether a reasonable doctor or patient would consider the injury worthy of treatment, the impact of the ailment upon an individual's daily activities, and the severity and persistence of pain. *See Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998). A serious medical condition exists where the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain. *Id*. The Second Circuit has held that the alleged deprivation must be "sufficiently serious, in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists." *Hemmings v. Gorczyk*, 134 F.3d 104, 108 (2d Cir. 1998).

The subjective component requires evidence that the defendant acted with a "sufficiently culpable state of mind." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). "[A] prison official does not act in a deliberately indifferent manner unless that official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Hathaway*, 37 F.3d at 66 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). In *Estelle*, the Supreme Court ruled that deliberate indifference may manifest itself in a doctor's refusal to administer needed treatment, a prison guard's intentional denial or delay in granting an inmate access to medical care, or intentional interference with prescribed treatment. 429 U.S. at 104–05. "[T]he subjective element of deliberate indifference 'entails something more than mere negligence . . . [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" *Hathaway*, 99 F.3d at 553 (quoting *Farmer*, 511 U.S. at 835).

As the Court of Appeals has noted, the "deliberate indifference" element describes a state of mind that is "equivalent to criminal recklessness." *Hemmings*, 134 F.3d at 108 ("The required state of mind [for a deliberate-indifference claim under the Eighth Amendment], equivalent to criminal recklessness, is that the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists; and he must also draw the inference." (internal quotation marks omitted)); *Hathaway*, 99 F.3d at 553 ("The subjective element requires a state of mind that is the

equivalent of criminal recklessness . . . .").  Furthermore, "[i]t is well-established that mere disagreement over the proper treatment does not create a constitutional claim.  So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation."  *Chance*, 143 F.3d at 703.

Expert testimony is not necessary to support a deliberate indifference claim under the Eighth Amendment.  *See Hathaway*, 37 F.3d at 68 ("We have never required plaintiffs alleging a denial of adequate medical care in a Section 1983 action to produce expert medical testimony.  The inquiry remains whether the treating physician or other prison official was deliberately indifferent to a prisoner's serious medical needs, not whether the doctor's conduct is actionable under state malpractice law."); *see also Oliver v. Robert L. Yeager Mental Health Ctr.*, 398 F.3d 183, 191 (2d Cir. 2005); *Cumberbatch v. Port Auth. of N.Y. & N.J.*, No. 03 Civ. 749(BSJ), 2006 WL 3543670, at *9 (S.D.N.Y. Dec. 5, 2006).

In this case, there is no dispute regarding the seriousness of Mathews' medical conditions.  *See Beatty v. Davidson*, 713 F. Supp. 2d 167, 174 (W.D.N.Y. 2010) ("[D]iabetes is a sufficiently serious medical condition to meet the objective prong."); *see also Gaines v. Armor Health Care, Inc.*, No. 12-CV-5663 (JS)(WDW), 2013 WL 6410311, at *5 (E.D.N.Y. Dec. 9, 2013) ("MRSA indeed could be a sufficiently serious condition.").  Still, as the Second Circuit has noted, "it's the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the

prisoner's underlying medical condition, considered in the abstract, that is relevant for

Eighth Amendment purposes." *Smith v. Carpenter*, 316 F.3d 178, 186 (2d Cir. 2003).

According to Mathews, his treatment was deficient in a number of ways, and those deficiencies demonstrate deliberate indifference. He asserts that Defendants should have ascertained whether he was a Type 1 or Type 2 diabetic. He faults Defendants for not switching him to long-lasting insulin earlier than January 2012, which he says would have better managed his blood sugar during the day, and would have helped with compliance since it was sometimes difficult for him to go to the infirmary for treatment. Similarly, he asserts that his compliance with his MRSA antibiotic regimen would have been improved if it had been administered in the afternoons to avoid the nausea he experienced when he received the medication before breakfast. He also faults Defendants for failing to promptly provide diabetic footwear. Finally, Mathews asserts that his occasional noncompliance or refusal of care demonstrates that Defendants failed to provide him with adequate education regarding the risks of diabetes and the significance of diabetes treatment.

I conclude that the alleged deficiencies in Mathews' medical treatment do not rise to the level of a constitutional deprivation. The medical records in this case indicate that Mathews received substantial medical attention. Between Mathews' admission to CRCF in May 2010 and his release in March 2012, the medical records before the court document numerous medical interactions, including progress notes, physicians' orders, specialist visits, diabetic flow sheets, medication administrations, wound care flow sheets, and chronic care periodic examinations. Moreover, even though there is a dispute

about how to characterize Mathews' noncompliance with treatment, it is undisputed that he was noncompliant on occasion, and the record in this case indicates that Mathews was noncompliant more than just sporadically.[9]  That presents a significant hurdle for his Eighth Amendment claim.  *See, e.g.*, *Mendoza v. Schult*, Civ. No. 9:09-CV-466 (LEK/RFT), 2011 WL 4592381, at *5 (N.D.N.Y. Sept. 14, 2011) ("A prisoner who declines medical treatment cannot turn around and sue the medical professional for deliberate indifference whose judgment the prisoner has questioned and even defied.").  Against that general backdrop, I turn to Mathews' specific claims.

To the extent that the medical records suggest that Defendants did not determine whether Mathews is a Type 1 or Type 2 diabetic, Mathews does not explain how that alleged failure caused any particular risk of harm.  He points to an article that explains that "treatment emphasis" differs between Type 1 and Type 2:

> Type 1 diabetes is understood to be caused by a relative insulin deficiency that results in inadequate amounts of insulin to facilitate glucose metabolism.  Therefore, the primary treatment focus is achieving adequate insulin levels relative to food intake.  Type 2 diabetes is understood to be caused by relative insulin resistance.  In other words, the available insulin is ineffective in facilitating glucose metabolism.  It is understood that this insulin ineffectiveness may be related to excess body weight.  Therefore, for many patients, the primary treatment focus is achieving weight reduction towards ideal body weight.

---

[9]  In addition to Dr. Rappaport's opinion as to what the medical records show, it is instructive to review the opinions of some of the other providers.  For example, a nurse remarked in progress notes dated October 31, 2011 that "[a] review of medical records shows inmate is noncompliant with all diabetic care."  (Doc. 63-6 at 42.)  Dr. Weischedel stated in a November 22, 2011 progress note that "[r]eview of the chart shows that the patient has been repeatedly noncompliant with meds and therapy."  (*Id.* at 46.)  Dr. Burroughs-Biron wrote in a December 6, 2011 progress note that Mathews "has been resistant to [treatment] and nonadherent with medication and other [treatment] regimes."  (*Id.* at 47.)

(Doc. 64-9 at 2, NCCHC Clinical Guideline for Health Care in Correctional Settings Diabetes.)  The article also explains that "Type 2 diabetes patients who require insulin may need to have their insulin needs managed similarly to type 1 diabetes." (*Id.*)  Here, it is undisputed that Mathews received insulin treatment.  To the extent that Mathews alleges that his "primary treatment focus" (aside from insulin treatment) was incorrect, he has not demonstrated any particular risk of harm.  Mathews offers no evidence regarding what "treatment focus" Defendants used, nor does he present evidence that Defendants failed to offer treatment regarding insulin levels relative to food intake or weight reduction.

Mathews' assertions that he should have been switched to long-lasting insulin earlier, and that his MRSA antibiotics should have been administered in the afternoon, do not demonstrate constitutional inadequacy.  Mathews' arguments are essentially disagreements over medication or proper treatment; they cannot be grounds for a § 1983 claim.  *See Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001) ("[D]isagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention, are not adequate grounds for a Section 1983 claim.  These issues implicate medical judgments and, at worst, negligence amounting to medical practice, but not the Eighth Amendment.").

Regarding diabetic shoes, it appears that Mathews did ultimately receive them, but he asserts that they should have been provided promptly in 2010.  (Doc. 64 at 11.)  Here, the record demonstrates that Mathews was referred to a podiatrist the month after he

arrived at NSCF, although the podiatrist did not prescribe special footwear at that time. Thereafter, at least some of the delay was caused by Mathews himself, both when he refused the March 2011 follow-up with Dr. Lamontagne, and when he refused further treatment on November 1, 2011 after Dr. Lamontagne's September 28, 2011 prescription. Moreover, Mathews has not shown that any delay in receiving diabetic shoes caused the harm that he complains of.  *See May v. MDOC*, No. 4:13cv64-DMB-DAS, 2014 WL 1118156, at *3 (N.D. Miss. Mar. 20, 2014) (plaintiff failed to demonstrate that any delay in receiving diabetic shoes resulted in substantial harm); *Ladner v. Woodall*, No. 2:12-cv-131-MTP, 2014 WL 29114, at *5 n.10 (S.D. Miss. Jan 3, 2014) (plaintiff failed to provide evidence that delay in receiving a new pair of diabetic shoes resulted in his disease being advanced).

Finally, Mathews asserts that his occasional noncompliance or refusal of care demonstrates that Defendants failed to provide him with adequate education regarding the risks of diabetes and the significance of diabetes treatment.  As noted above, the court in this procedural context is required to interpret ambiguities and resolve inferences in Mathews' favor.  However, it is too great a leap to conclude that Mathews' noncompliance and refusals of care prove that Defendants' educational efforts were constitutionally inadequate.  The record demonstrates numerous attempts by different providers to provide education.  Mathews does not suggest how else the information should have been presented.  Nor does he list a lack of understanding among the reasons that he refused treatment.

Along similar lines, Mathews asserts that Defendants "were indifferent to the reasons for [his] occasional refusals of treatment."  (Doc. 64 at 9.)  Presumably, Mathews is asserting that Defendants should have done more to determine why he was refusing treatment, and should have sought ways to remove barriers to compliance.  Mathews does not explain, however, what more he thinks Defendants should have done.  Defendants had multiple conversations with Mathews about compliance, urged him to comply with treatment, and made treatment available.  Dr. Burroughs-Biron even contacted Matthews' mother in an attempt to find ways to convince him to accept treatment.  Assuming that Defendants should have done more to determine why Mathews was noncompliant, that failing was negligence at most.

### C.     Racial Discrimination—Personal Involvement

In addition to his Eighth Amendment claims, Mathews claims that Defendants violated his Fourteenth Amendment rights by favoring white inmates for medical treatment.  Defendants Bull, Ettlinger, and Pallito argue that Mathews has failed to introduce any evidence that they were involved in any racial discrimination.  Defendant CCS argues that it is entitled to summary judgment on the claim because Mathews has not shown the existence of a custom or practice of racial discrimination.  Mathews notes that he has presented evidence of racial discrimination by a nurse at NSCF ("Lori"—not Defendant Lori Bull and not a Defendant in this case) who made racist comments or jokes to other inmates, and who skipped over African-American inmates in favor of white inmates when providing medical treatment.  (*See* Doc. 64-11, Mathews Dep. 120, 123.)

24

Mathews claims that "[a]s the employer, Defendant CCS has violated its duty to properly train and supervise its employees."  (Doc. 64 at 12.)

Mathews apparently does not dispute that Defendants Bull, Ettlinger, and Pallito had no personal involvement with the alleged racial discrimination.  His sole claim is that CCS violated its duty to properly train and supervise its employees.  As noted above, CCS can be liable under § 1983 if Mathews "proves that 'action pursuant to official . . . policy of some nature caused a constitutional tort.'"  *Rojas*, 924 F.2d at 408 (quoting *Monell*, 436 U.S. at 691).  Here, Mathews has presented no evidence that CCS had any policy that encouraged or ratified the nurse's behavior.  Mathews' racial discrimination claim against CCS must therefore fail.  *See Gauthier v. Kirkpatrick*, No. 2:13-cv-187, 2013 WL 6407716, at *10 (D. Vt. Dec. 9, 2013) (conclusory allegation of a practice of constitutional deprivations insufficient to defeat a motion to dismiss).

## III.    Mathews' State-Law Claims

In addition to his § 1983 claims, Mathews is asserting state-law negligence claims against all Defendants.  (*See* Doc. 37 at 4–5.)  Defendants argue that Mathews' negligence claims fail because he has not identified an expert to establish the standard of care or its breach.  Mathews argues that he does not need an expert because the violation is apparent even without expert testimony, and because he has supplied documents setting forth the standards of care for diabetes treatment in a correctional setting.[10] Defendants insist that expert testimony is essential to Mathews' negligence claims, and

---

[10]  The documents upon which Mathews relies are in the record as Document Nos. 64-7, 64-8, and 64-9.

that Mathews cannot establish that his treatment was inappropriate by relying upon general statements contained in generic published materials.

I conclude that the court need not resolve that issue. If the court agrees with the above conclusions regarding Mathews' § 1983 claim, then the court should decline to retain supplemental jurisdiction over the state-law claims. *See* 28 U.S.C. § 1367(c)(3); *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims."); *Matican v. City of New York*, 524 F.3d 151, 154–55 (2d Cir. 2008) ("[I]f [plaintiff] has no valid claim under § 1983 against any defendant, it is within the district court's discretion to decline to exercise supplemental jurisdiction over the pendent state-law claims.").

## Conclusion

For the reasons set forth above, I recommend that Defendants' Motion for Summary Judgment (Doc. 63) be GRANTED, that Mathews' § 1983 claims against all Defendants be DISMISSED, and that Mathews' state-law claims against Defendants be DISMISSED without prejudice. Accordingly, Mathews' Amended Complaint (Doc. 37) should also be DISMISSED, with prejudice on the § 1983 claims and without prejudice on the state-law claims.

Dated at Burlington, in the District of Vermont, this 30th day of July, 2014.


                                         /s/ John M. Conroy
                                         John M. Conroy
                                         United States Magistrate Judge


Any party may object to this Report and Recommendation within fourteen days after service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all parties, written objections which shall specifically identify those portions of the Report and Recommendation to which objection is made and the basis for such objections.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b)(2); L.R. 72(c). Failure to timely file such objections "operates as a waiver of any further judicial review of the magistrate's decision."  *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).

27